**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MOBASSA BOYD,
    *Petitioner-Appellant,*

v.

ANTHONY C. NEWLAND, Warden,
    *Respondent-Appellee.*

No. 03-17098

D.C. No.
CV-00-21287-RMW

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
Ronald M. Whyte, District Judge, Presiding

Argued and Submitted
October 4, 2004—San Francisco, California

Opinion Filed December 29, 2004
Amended June 26, 2006
Second Amendment October 26, 2006

Before: Richard D. Cudahy,* Susan P. Graber, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Graber

---

*The Honorable Richard D. Cudahy, Senior Judge, United States Court
of Appeals for the Seventh Circuit, sitting by designation.

17895

**COUNSEL**

Mark E. Eibert, Half Moon Bay, California, for the petitioner-appellant.

Glenn R. Pruden, Deputy Attorney General, State of California, San Francisco, California, for the respondent-appellee.

**ORDER**

The Amended Opinion filed on June 26, 2006, slip op. at 7011, and published at 455 F.3d 897 (9th Cir. 2006), is amended as follows:

On slip opinion page 7032, line 20, after the sentence ending "entire voir dire transcript" add:

> A transcript of the complete voir dire, as distinct from a partial transcript up to the time of the *Batson* motion, is proper because comparative juror analysis is appropriate both at the time of the *Batson* motion and in light of all subsequent voir dire testimony. *See*

*Wade*, 202 F.3d at 1198 (examining the complete voir dire transcript and holding that "we do not believe that the only relevant time at which to assess the would-be *prima facie* case is the time of the challenge"); *see also Miller-El II*, 125 S. Ct. at 2330 (examining the prosecutor's behavior both before and after the initial *Batson* motion).

On slip opinion page 7032, at the end of the second full paragraph, add "This conclusion is consistent with the court's recent en banc decision in *Kesser v. Cambra*, No. 02-15475, 2006 WL 2589425, at *8-*9 (9th Cir. Sept. 11, 2006) (en banc)."

On slip opinion page 7034, replace the final paragraph with the following:

> AFFIRMED in part; REVERSED and REMANDED in part, with instructions to enter a conditional writ of habeas corpus, ordering Mobassa Boyd's release unless the State provides to him, without charge, a complete voir dire transcript within a reasonable period of time, after which he may renew his *Batson* claim in the district court.

With these amendments, the panel has voted to deny the petition for rehearing and petition for rehearing en banc. Judges Graber and Fisher have voted to deny the petition for rehearing en banc and Judge Cudahy has so recommended.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on it.

The petition for rehearing and petition for rehearing en banc are DENIED. No further petitions for rehearing or petitions for rehearing en banc may be filed.

## OPINION

GRABER, Circuit Judge:

The California courts denied a *Batson*[1] motion made by Petitioner Mobassa Boyd and denied his request for a free transcript of the entire voir dire for use on appeal. We must ask whether those rulings were contrary to, or unreasonably applied, clearly established federal law as determined by the Supreme Court. In an earlier decision in this case, we answered "no." *Boyd v. Newland*, 393 F.3d 1008 (9th Cir. 2004). In response to a petition for rehearing and in light of recent Supreme Court cases clarifying *Batson v. Kentucky*, 476 U.S. 79 (1986), we conclude that our earlier analysis was flawed. We now hold that the California appellate courts violated clearly established federal law by denying Petitioner's habeas petition because, without an entire voir dire transcript, those courts could not evaluate the relevant circumstances surrounding the contested strike, as *Batson* requires. In that respect we reverse and remand with instructions to grant the petition for a writ of habeas corpus.

Petitioner also argues that the California courts erred by enhancing his sentence because of a nonjury juvenile adjudication. As in our earlier decision, we disagree and, in this respect, affirm.

## FACTUAL AND PROCEDURAL HISTORY

Petitioner Mobassa Boyd is African-American. He was charged in California with unlawfully possessing a firearm after having previously suffered a juvenile adjudication for a felony, Cal. Penal Code § 12021(e), and with unlawfully possessing a sawed-off shotgun, *id.* § 12020(a)(1).

---

[1]*Batson v. Kentucky*, 476 U.S. 79 (1986).

During voir dire, the prosecutor used a peremptory strike to excuse an African-American prospective juror. Petitioner's counsel made a *Batson* motion, asserting that the strike was race-based.[2] At the time of the disputed peremptory challenge, another African-American potential juror had been stricken for cause; two other African-Americans remained as potential jurors; and the prosecutor had used two other peremptory challenges on non-African-American jurors. The trial court denied the motion, finding that Petitioner's "showing falls short of showing a prima facie case" of racial bias in the prosecutor's use of the peremptory challenge.

The jury that eventually was empaneled convicted Petitioner. Petitioner waived his right to have a jury determine the truth of his prior juvenile adjudication. The trial court found the juvenile adjudication to be true and, accordingly, increased Petitioner's sentence from three to six years. Cal. Penal Code §§ 667(d)(3), 1170.12(b)(3).

Petitioner filed three requests to supplement the record to include the entire voir dire transcript. The California Court of Appeal granted Petitioner's requests in part and required that he be provided the voir dire of the excused African-American juror plus his counsel's argument under *Batson*. But the court of appeal denied Petitioner's requests for the entire voir dire transcript because it concluded that he did not comply with a California local rule that requires a defendant to "establish with some certainty how the requested materials may be useful on appeal." Cal. Ct. App., First App. Dist. Local Rule 6(d) (2003). The court also relied on controlling California precedent, which does not require a court to provide a defendant

---

[2]Petitioner's counsel challenged the peremptory strike under *People v. Wheeler*, 583 P.2d 748 (Cal. 1978). *Wheeler* prohibits, under the California Constitution, the use of racially motivated peremptory challenges. *Id.* at 761-62. A *Wheeler* motion serves as an implicit objection under *Batson*, *People v. Yeoman*, 72 P.3d 1166, 1187-88 (Cal. 2003), so Petitioner preserved his federal constitutional claim. Accordingly, we refer to counsel's objection as a *Batson* motion.

with an entire voir dire transcript free of charge. *See People v. Landry*, 56 Cal. Rptr. 2d 824, 828 (Ct. App. 1996) (holding that when the purpose of the request is to compare the testimony of jurors, but no such comparison was made at the trial level, a court need not provide a free voir dire transcript).

On direct appeal to the California Court of Appeal, Petitioner challenged the denial of his *Batson* motion. The court of appeal affirmed Petitioner's conviction, and the California Supreme Court denied his petition for review without comment.[3] After exhausting state-court post-conviction procedures without success, Petitioner petitioned for a writ of habeas corpus in federal district court. The district court denied his petition. Petitioner now appeals to us.

## STANDARD OF REVIEW

We review de novo a denial of a petition for habeas corpus. *Dubria v. Smith*, 224 F.3d 995, 1000 (9th Cir. 2000) (en banc).

We may not disturb a state court's determination unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).

## DISCUSSION

### A.  Batson *Claim*

**[1]** To succeed on his charge of racial bias, Petitioner first must establish a prima facie case of purposeful discrimination. *Batson*, 476 U.S. at 93-94; *Tolbert v. Page*, 182 F.3d

---

[3]Under AEDPA, we review the last reasoned state-court decision. *Brodit v. Cambra*, 350 F.3d 985, 987 (9th Cir. 2003). Accordingly, we examine the California Court of Appeal's decision here.

677, 680 (9th Cir. 1999) (en banc). He must show that (1) the prospective juror is a member of a "cognizable racial group," (2) the prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motived by race. *Batson*, 476 U.S. at 96; *Cooperwood v. Cambra*, 245 F.3d 1042, 1045-46 (9th Cir. 2001). If he failed to establish a prima facie case, then the motion properly was denied; the prosecutor need not have provided a race-neutral explanation for the strike. *Batson*, 476 U.S. at 96-97; *Cooperwood*, 245 F.3d at 1046.

**[2]** The first and second elements of the test are met, because the prospective juror is African-American, and the prosecutor used a peremptory strike to remove the juror. Only the third element of the prima facie case is at issue, that is, whether the state court erred in failing to recognize an inference of racial motivation.

Petitioner first argues that the California Court of Appeal's decision was "contrary to" federal law, 28 U.S.C. § 2254(d)(1), because the court used an incorrect legal standard in determining whether he had made out a prima facie case. If he were correct, we would not defer to the state court. *See Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000) (holding that when the state court uses the wrong legal standard, the rule of deference does not apply). But we read the state court's decision differently.

In affirming the trial court's ruling on the peremptory strike, the California Court of Appeal wrote that Petitioner had not shown a "strong likelihood" that the prosecutor's challenge had been motivated by racial considerations. The "strong likelihood" wording originates from *Wheeler*, the California equivalent of *Batson*, and the *Wheeler* standard impermissibly places on the defendant a more onerous burden of proof than that required by the "raise an inference" standard of *Batson*. *See Johnson v. California*, 125 S. Ct. 2410, 2413-14 (2005) (agreeing with the Ninth Circuit that the *Wheeler*

standard, which requires a petitioner to show that a peremptory challenge more likely than not was based on impermissible group bias, is more demanding than the standard enunciated in *Batson*, and therefore violates the Constitution); *Wade*, 202 F.3d at 1192 ("We hold that the *Wheeler* standard, as currently interpreted by the California courts, does not satisfy the constitutional requirement laid down in *Batson*.").

**[3]** But the California court did not stop there. It also held that Petitioner "clearly did not establish a prima facie case of group discrimination, even under federal precedent." In other words, the court of appeal did not rely only on the *Wheeler* standard, instead holding that Petitioner had failed to establish a prima facie case under *either* state *or* federal law. Because the court of appeal recognized the difference between the two standards, and affirmed the trial court under both, its determination deserves deference. *See Tolbert*, 182 F.3d at 682-83 (describing deference owed to state court's prima facie determination under *Batson*).

Petitioner also argues that the California courts were wrong to conclude that he failed to establish a prima facie case under *Batson*. We previously held that Petitioner did not make a prima facie case of purposeful discrimination. *Boyd*, 393 F.3d at 1013. Shortly after we published our decision, however, the Supreme Court issued two opinions dealing with the application of *Batson* to peremptory challenges: *Johnson v. California*, 125 S. Ct. 2410 (2005), and *Miller-El v. Dretke*, 125 S. Ct. 2317 (2005) (*Miller-El II*).[4] We asked the parties for

---

[4]This is not the first time that the Supreme Court granted certiorari in that case. In *Miller-El v. Cockrell*, 537 U.S. 322, 326-27 (2003) (*Miller-El I*), the Supreme Court reviewed the petitioner's challenge to the denial of his request for a certificate of appealability ("COA") so that he could pursue habeas corpus relief based on a claim of group bias in jury selection. At Miller-El's trial, the prosecution used peremptory strikes against 10 of 11 African-American prospective jurors. *Id.* at 326. Miller-El's trial predated *Batson*, but by the time he filed his federal habeas motion, *Batson*

additional briefing to discuss the implications of those deci-
sions for this case. After further consideration, we now con-
clude that our previous opinion misunderstood *Batson* and
that, without an entire voir dire transcript, the California
appellate courts could not have considered the circumstances
surrounding the contested strike, could not have evaluated the
potential inference of racial bias, and therefore could not
properly have found that Petitioner failed to establish a prima
facie case.

[4] In *Johnson*, the Supreme Court reviewed the level of
proof necessary to establish a prima facie case of discrimina-
tion under the first step of *Batson*. 125 S. Ct. at 2416. In *John-
son*, the prosecution used three of its 12 peremptory
challenges to strike the only African-American prospective
jurors from the pool. *Id.* at 2414. Defense counsel made *Bat-
son* motions after the second and third strikes against African-
American prospective jurors. After the latter *Batson* motion,
the trial court concluded that, although the situation was "very
close," the defense had not established a prima facie case of
racial bias. *Id.* The Supreme Court reversed, emphasizing that
the threshold for making a prima facie *Batson* claim is quite
low:

> We did not intend the first step to be so onerous that
> a defendant would have to persuade the judge—on
> the basis of all the facts, some of which are impossi-
> ble for the defendant to know with certainty—that
> the challenge was more likely than not the product

---

was well entrenched. *Id.* at 327. The Fifth Circuit refused to grant a COA,
concluding that the petitioner had failed to establish a viable claim of con-
stitutional error. *Id.* at 326-27. The Supreme Court reversed, finding that
it was at least debatable whether a violation of Miller-El's constitutional
rights had occurred. *Id.* at 348. After a remand, the Fifth Circuit denied
Miller-El's habeas petition on the merits. The Supreme Court again
granted certiorari in *Miller-El II*, to consider whether the circuit court's
decision was correct.

of purposeful discrimination. Instead, a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.

*Id.* at 2417.

**[5]** On the same day, the Supreme Court also decided *Miller-El II*. In *Miller-El II*, the Court used comparative juror analysis at the appellate level to determine whether the prosecution had been motivated by racial bias in exercising its peremptory strikes. 125 S. Ct. at 2325-38. "Comparative juror analysis" refers, in this context, to an examination of a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group. *See, e.g.*, *id.* (engaging in comparative juror analysis); *Mitleider v. Hall*, 391 F.3d 1039, 1049 n.9 (9th Cir. 2004) (conducting a comparative juror analysis to discern whether differing life experiences justified the use of a peremptory strike against an African-American juror in a case in which a prima facie showing had been made), *cert. denied*, 125 S. Ct. 2968 (2005). *Miller-El II* made clear that comparative juror analysis is an important tool that courts should utilize in assessing *Batson* claims: "More powerful than these bare statistics [revealing that the prosecution struck 91% of black potential jurors], however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve." 125 S. Ct. at 2325.

**[6]** Both *Johnson* and *Miller-El II* were decided after Petitioner's conviction became final. The government has argued that even if *Miller-El II* requires or encourages comparative juror analysis on appeal, its rule cannot apply to the case at hand under *Teague v. Lane*, 489 U.S. 288 (1989). *Teague* held that federal habeas corpus petitioners cannot rely on new constitutional rules of criminal procedure that took effect *after*

their convictions became final. *Id.* at 310.[5] Because the government argues that Petitioner is requesting the benefit of a rule decided after his original appeal was decided, and thus after his conviction became final, we must address *Teague* before turning to the merits of his claim. *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994). We are convinced that *Johnson* and *Miller-El II* merely clarify *Batson* and do not establish new rules of criminal procedure.

[7] *Johnson* discusses the standard that *Batson* first established. The *Johnson* opinion relies almost exclusively on the wording used in the *Batson* opinion; we have concluded that *Johnson* explains *Batson*, *see Yee v. Duncan*, 441 F.3d 851, 857 n.9 (9th Cir. 2006) (noting that *Johnson* is "an example of the Supreme Court's consistent interpretation of *Batson* to date" but not deciding the *Teague* issue); and the state does not contend that *Johnson* established a new rule, *see Caspari*, 510 U.S. at 389 (noting that if the state does not argue that *Teague* applies, a court need not consider it).

[8] Neither does *Miller-El II* create a new rule of criminal procedure. Instead, it simply illustrates the means by which a petitioner can establish, and should be allowed to establish, a *Batson* error. *See Murphy v. Dretke*, 416 F.3d 427, 439 (5th Cir. 2005) (stating that in *Miller-El II*, the Court did not announce "any new elements or criteria for determining a *Batson* claim" but merely applied *Batson* in the circumstances of that particular case), *cert. denied*, 126 S. Ct. 1028 (2006). *Miller-El II* fits within the *Batson* framework, which provides that "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Batson*, 476 U.S. at 97. *Batson* itself required courts to consider the "totality of the relevant facts" and "all relevant circumstances" sur-

---

[5]There was no majority opinion in *Teague*. However, the Court has treated Justice O'Connor's plurality opinion as embodying its holding. *See, e.g.*, *Tyler v. Cain*, 533 U.S. 656, 665 (2001).

rounding the peremptory strike. *Id.* at 94, 96. Moreover, we are persuaded that the opinion's support of comparative juror analysis on appeal did not create a new rule because the Supreme Court applied the rule to Miller-El himself. The *Teague* rule applies to the Supreme Court as well as to lower courts. *See Sawyer v. Smith*, 497 U.S. 227, 239 (1990) (affirming the lower court's refusal to apply the holding of one of the Court's previous opinions to a defendant because the rule established in that case was new). Therefore, if the Supreme Court's endorsement of comparative juror analysis on appeal constituted a new procedural rule, the Court would not have applied that rule to Miller-El, whose case came before the Court on an appeal from a denial of habeas corpus. *Miller-El v. Dretke*, 361 F.3d 849 (5th Cir. 2004). Because the Court did engage in extensive comparative juror analysis, we can infer that *Miller-El II* must only have clarified the extant *Batson* three-step framework. *See Frazer v. South Carolina*, 430 F.3d 696, 704-06 (4th Cir. 2005) (concluding that an earlier Supreme Court case did not establish a new rule because, procedurally, the case reached the Court on a challenge to a denial of habeas corpus but the Court addressed the merits of the petitioner's claim and remanded for further proceedings, which it could not have done under *Teague* if it were creating a new rule).

[9] Accordingly, we now turn to the merits of Petitioner's *Batson* claim. In order to determine, at the first *Batson* step, whether racial bias motivated a prosecutor's decision to remove a potential juror, a court must consider the "totality of the relevant facts" and "all relevant circumstances" surrounding the peremptory strike. *Batson*, 476 U.S. at 94, 96. Thus, when a defendant raises a plausible *Batson* claim, a court must analyze the context in which the contested peremptory strike arose. *See Johnson*, 125 S. Ct. at 2419 (reversing the state court's denial of habeas corpus because all three of the African-American prospective jurors were stricken and the state court judges found the circumstances suspicious). In our

earlier *Boyd* opinion, we misread *Batson* to require more certainty of discriminatory motive.

**[10]** In this case, it is clear that the Petitioner raised at least a plausible *Batson* claim and that contextual analysis is therefore appropriate. After the prosecutor used a peremptory challenge to strike an African-American juror (Petitioner is of the same race), Petitioner's counsel objected, arguing that this was the second African-American juror removed from the jury pool (the first having been removed for cause), there remained only two potential African-American jurors in the pool, and nothing in the struck juror's voir dire responses intimated a legitimate basis for removal. These facts, though not alone sufficient to establish a prima facie case, suggest that Petitioner's *Batson* claim was at least plausible, and the court should consider context in order to determine whether Petitioner has raised an inference of discrimination. *See Johnson*, 125 S. Ct. at 2417.

**[11]** There are two main ways that we could consider Petitioner's *Batson* claim in light of the "totality of the relevant facts." *Batson*, 476 U.S. at 94. But, for both of them, we are stymied by the California courts' refusal to provide an entire voir dire transcript to Petitioner.

First, we could look at percentages. Here, the prosecution used its third peremptory strike to dismiss an African-American prospective juror. The first two peremptory strikes were used against prospective jurors who were not African-American. We have held that, "[t]o establish a prima facie case, [a petitioner does] not need to show that the prosecution ha[s] engaged in a pattern of discriminatory strikes against more than one prospective juror" because "the Constitution forbids striking even a single prospective juror for a discriminatory purpose." *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994). Nonetheless, in some cases, courts have found it helpful to compare the number of minority prospective jurors stricken to non-minority prospective jurors

stricken. *See Miller-El II*, 125 S. Ct. at 2325 (noting that "[t]he numbers describing the prosecution's use of peremptories are remarkable."); *Wade*, 202 F.3d at 1198 (reviewing the statistical evidence of the number of African-American potential jurors stricken compared to the racial makeup of the other potential jurors who were struck and of the pool at large, although noting that statistical disparities can be misleading).

We know only that the prosecutor used a peremptory strike to remove one African-American juror and that two other African-American prospective jurors remained in the pool at that time. Because the state courts did not furnish a complete voir dire transcript to Petitioner, who is indigent, we lack the additional data that would allow the kind of statistical analysis that both the Supreme Court and this court have performed in the past.

Second, we could assess "all relevant circumstances," *Batson*, 476 U.S. at 96, surrounding the challenged peremptory strike by engaging in comparative juror analysis. To support his claim, Petitioner contends here, as did his trial counsel in the first instance, that no nonracial reason existed for the peremptory challenge. In order to assess Petitioner's claim, we must compare the prospective juror who was stricken with the other prospective jurors who were not.

**[12]** In our first *Boyd* opinion, we held that *Batson* does not compel a court to conduct comparative juror analysis for the first time on appeal. *Boyd*, 393 F.3d at 1015. We looked to California cases that require a petitioner to preserve the issue at trial, in order for a court to consider comparative juror analysis on appeal. *See, e.g.*, *People v. Johnson*, 71 P.3d 270, 285 (Cal. 2003) (noting that the court maintains its "longstanding practice" of refusing to engage in comparative juror analysis for the first time on appeal), *rev'd on other grounds*, *Johnson*, 125 S. Ct. 2410. But after *Miller-El II*, we recognize that our previous reading of *Batson* was too narrow and that *Batson* does contemplate a comparative juror analysis on appeal. In

*Miller-El II*, the prosecution used 10 of its peremptory chal-
lenges to strike African-American jurors, leaving only one
African-American juror in the pool. 125 S. Ct. at 2325. After
Miller-El was convicted, but while his appeal was pending,
the Supreme Court decided *Batson*. *Id.* at 2346 (Thomas, J.,
dissenting). The state court of appeals remanded the case for
a *Batson* hearing, where defense counsel presented some evi-
dence about the jurors who were struck and the government
was forced to explain its strikes. *Id.*

**[13]** The Supreme Court, though, looked beyond the evi-
dence that Miller-El had presented to the trial court and con-
ducted a comprehensive comparative juror analysis on appeal.
*Id.* at 2325-38 & 2326 n.2. Accordingly, the California courts'
view that comparative juror analysis can take place on appeal
only when the trial court engaged in such analysis in the first
instance has been called into question:

> Defendant asks us to examine the responses of
> jurors other than Juror T. [,the African-American
> juror struck,] in determining whether the trial court
> erred in finding that defendant failed to establish a
> prima facie case of group bias. In earlier cases we
> explained that, although such an examination is
> appropriate at the trial court level when the issue is
> properly brought to that court's attention, such an
> examination for the first time on appeal is unreliable.
> Defendant urges reconsideration of these cases in
> light of the high court's decision in *Johnson*, in
> which the court did not comment upon whether com-
> parative analysis should be undertaken for the first
> time on appeal, and another decision issued the same
> day, *Miller-El [II]*, in which the court employed
> comparative juror analysis in circumstances in which
> it was undisputed that a prima facie case had been
> made. Assuming without deciding that a compara-
> tive juror analysis should be undertaken under the
> circumstances presented [in which the trial court

found that the defendant failed to make a prima facie case], we conclude [that] defendant's proffered analysis fails to establish a prima facie case of group bias.

*People v. Cornwell*, 117 P.3d 622, 635 (Cal. 2005) (citations omitted), *cert. denied*, 126 S. Ct. 1432 (2006). Like the various California courts to address the issue, we do not hold that comparative juror analysis *always* is compelled at the appellate level. *See, e.g.*, *People v. Ward*, 114 P.3d 717, 728 (Cal. 2005) (declining to decide whether *Miller-El II* requires comparative juror analysis on appeal, but concluding that even if it did, such an analysis did not support the defendant's claim that the prosecution's peremptory strikes were motivated by racial bias), *cert. denied*, 126 S. Ct. 1625 (2006). But, comparative juror analysis is an important tool that courts *should* use on appeal.

**[14]** Moreover, because comparative juror analysis assists a court in determining whether the totality of the circumstances gives rise to an inference of discrimination, we believe that this analysis is called for on appeal even when the trial court ruled that the defendant failed to make a prima facie showing at the first step of the *Batson* analysis. Without engaging in comparative juror analysis, we are unable to review meaningfully whether the trial court's ruling at either step one or step three of *Batson* was unreasonable in light of Supreme Court precedent. In *Miller-El II*, the trial court concluded that the defendant had made a prima facie case and had asked the prosecution to provide race-neutral reasons for the strikes. 125 S. Ct. at 2323. The Court, on review, at the third *Batson* step considered the written and oral statements made by all the prospective jurors and the prosecution's stated reasons for dismissing the African-American jurors to determine whether race played a role in the prosecution's use of its peremptory strikes. *Id.* at 2325-38.

Some California courts have questioned whether comparative juror analysis is similarly appropriate at the first *Batson*

step, where the prosecution has not voiced its rationales for the strikes, instead of at the third *Batson* step. *See, e.g.*, *People v. Gray*, 118 P.3d 496, 511 (Cal. 2005) ("*Miller-El [II]* thus did not consider whether an appellate court must conduct a comparative juror analysis in the first instance, when the objector has failed to make a prima facie showing of discrimination, or whether an appellate court must conduct a comparative juror analysis for the first time on appeal, when the objector failed to do so at trial."), *petition for cert. filed*, ___ U.S.L.W. ___ (U.S. Feb. 23, 2006) (No. 05-9564); *People v. Guerra*, 129 P.3d 321, 351 (Cal. 2006) ("Performing a comparative analysis is problematic when, as here, the prosecutor did not provide reasons for the challenge because the trial court found no prima facie case had been established."). We believe, however, that Supreme Court precedent requires a comparative juror analysis even when the trial court has concluded that the defendant failed to make a prima facie case.

In *Miller-El II*, the Supreme Court did not merely review the reasons that the prosecutor gave for peremptorily striking the African-American jurors; instead it also considered the *voir dire questions* that the prosecutor had posed to the various jurors. 125 S. Ct. at 2333-38. The Court concluded that the prosecutor asked different questions of minority prospective jurors from those it asked of nonminority prospective jurors in order to elicit different responses, which could then justify a peremptory strike on purportedly nonracial grounds. *Id.* at 2337. In some circumstances, a court may have to review the questions that the prosecution asked of jurors at step one of the *Batson* analysis to determine whether a defendant has made a prima facie showing of unlawful discrimination. There is nothing that suggests that it is more difficult or less desirable to engage in such analysis at step one rather than step three of *Batson*. *Cf. United States v. Esparza-Gonzalez*, 422 F.3d 897, 904-05 (9th Cir. 2005) (engaging, on direct review, in comparative juror analysis to hold that the defendant established a prima facie case of intentional unlawful discrimination).

Further, both *Johnson* and *Miller-El II* suggest that courts should engage in a rigorous review of a prosecution's use of peremptory strikes. If a trial court's conclusion that a defendant failed to make a prima facie case could insulate from review a prosecution's use of peremptory strikes, the holdings of those Supreme Court opinions would be undermined.

**[15]** But we can engage in no comparative juror analysis here, because we do not know what happened during the entirety of the voir dire. Because we hold that, under the clearly established Supreme Court precedent of *Batson*, comparative juror analysis is an important tool that courts should utilize on appeal when assessing a defendant's plausible *Batson* claim, we also must conclude that all defendants, including those who are indigent, have a right to have access to the tools which would enable them to develop their plausible *Batson* claims through comparative juror analysis.

"[T]he State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal." *Britt v. North Carolina*, 404 U.S. 226, 227 (1971). The Supreme Court has held that indigent defendants must be provided with various portions of the trial transcript. *See, e.g., id.* at 228 (stating that the transcript of a prior mistrial ordinarily can be assumed to be valuable to a defendant, although ultimately finding no error because an alternative to the transcript existed); *Williams v. Oklahoma City*, 395 U.S. 458, 458-59 (1969) (per curiam) (finding constitutional error where the state provided no trial transcript to an indigent defendant on appeal); *Gardner v. California*, 393 U.S. 367, 370-71 (1969) (holding that the indigent defendant had to be provided with a transcript of an evidentiary hearing from his original trial, so that he could file a new habeas petition); *Long v. Dist. Court of Iowa*, 385 U.S. 192, 192-94 (1966) (per curiam) (holding that a court's failure to provide a defendant with any portion of a habeas transcript was error). We recognize that the Court has never explicitly held that an indigent defendant is entitled to an entire voir dire

transcript as of right, but *Miller-El II* makes comparative juror analysis a centerpiece of the *Batson* analysis, and that analysis cannot be done in the absence of a voir dire transcript. Accordingly, the state court's refusal to provide Petitioner with the whole voir dire transcript, in the face of a plausible *Batson* claim, involved an unreasonable application of clearly established Supreme Court precedent.

In denying, in part, Petitioner's request for an entire voir dire transcript, the state courts relied on a California rule that requires an indigent defendant to "establish with some certainty how the requested materials may be useful on appeal" before it will provide a transcript free of charge.[6] Petitioner argues that the rule is unconstitutional because it places him in the untenable position of having to establish how the entire transcript would be helpful to him, without having access to the transcript to make such a showing.

We do not agree that local rule 6(d) violates the Constitution. The Supreme Court has upheld a federal statute that is similar to California's local rule 6(d). In *United States v. Mac-Collom*, 426 U.S. 317, 322-23 (1976) (plurality opinion), the Court concluded that a statute requiring a judge to make a finding that a habeas petition is not frivolous and that a transcript is needed, before providing an indigent defendant with a trial transcript, does not violate the United States Constitution. In short, the California rule requiring an indigent defendant to show a specific need to obtain a complete voir dire

---

[6]In pertinent part, the rule provides:

> A motion to augment the reporter's transcript shall identify the portion of the record with specificity, including the reporter and date of hearing. It shall establish with some certainty how the requested materials may be useful on appeal. Requests for jury voir dire should specify the exact questioning by which counsel of which juror together with the reason justifying the request.

Cal. Ct. App., First App. Dist. Local Rule 6(d).

transcript does not run counter to clearly established federal law.

The state court's error was simply in holding that an indigent defendant who raised a plausible *Batson* claim had failed to "establish with some certainty how the requested" voir dire transcript could help him on appeal, pursuant to local rule 6(d). *Batson* and its progeny explain why, as a matter of Supreme Court law, such a transcript may be useful on appeal.

**[16]** In summary, under Supreme Court precedent the burden for making a prima facie case is not an onerous one. *Johnson*, 125 S. Ct. at 2417. When an appellate court must decide whether the trial court that denied a *Batson* motion should instead have drawn "an inference that discrimination . . . occurred," *id.* at 2419, *Batson* supports the use of comparative juror analysis, *Miller-El II*, 125 S. Ct. at 2325-38. A reviewing court cannot examine the "totality of the relevant facts" and "all relevant circumstances," *Batson*, 476 U.S. at 94, 96, surrounding a prosecutor's peremptory strike of a minority potential juror without an entire voir dire transcript. A transcript of the complete voir dire, as distinct from a partial transcript up to the time of the *Batson* motion, is proper because comparative juror analysis is appropriate both at the time of the *Batson* motion and in light of all subsequent voir dire testimony. *See Wade*, 202 F.3d at 1198 (examining the complete voir dire transcript and holding that "we do not believe that the only relevant time at which to assess the would-be *prima facie* case is the time of the challenge"); *see also Miller-El II*, 125 S. Ct. at 2330 (examining the prosecutor's behavior both before and after the initial *Batson* motion). We do not hold that Petitioner has satisfied his burden of establishing a prima facie showing of unlawful discrimination under *Batson*'s first step. Rather, we hold that, in light of Petitioner's plausible *Batson* claim, the California appellate courts' denial of Petitioner's request for a complete voir dire transcript and a full comparative analysis of the venire unrea-

sonably applied clearly established federal law. This conclusion is consistent with the court's recent en banc decision in *Kesser v. Cambra*, No. 02-15475, 2006 WL 2589425, at *8-*9 (9th Cir. Sept. 11, 2006) (en banc).

## B. *Nonjury Juvenile Adjudication*

**[17]** Finally, Petitioner contends that the state court violated clearly established federal law by using a nonjury juvenile adjudication to increase his sentence from three to six years. In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the Supreme Court held that, "[o]ther than the fact of *a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (Emphasis added.) Petitioner argues that a juvenile adjudication does not qualify as a "conviction" under the *Apprendi* exception.

**[18]** We have held that the *Apprendi* "prior conviction" exception encompasses only those proceedings that provide a defendant with the procedural safeguards of a jury trial and of proof beyond a reasonable doubt. *United States v. Tighe*, 266 F.3d 1187, 1194 (9th Cir. 2001). Consequently, we do not recognize nonjury juvenile adjudications as "convictions" falling within the *Apprendi* exception, and ordinarily we do not allow sentencing enhancements based on such adjudications. *Id.* at 1194-95.

**[19]** California courts disagree with *Tighe*. They conclude that *Apprendi* does not preclude the use of nonjury juvenile adjudications to enhance the sentence of an adult offender. *See, e.g.*, *People v. Bowden*, 125 Cal. Rptr. 2d 513, 517 (Ct. App. 2002) ("[T]he *Tighe* majority opinion is unpersuasive, and we decline to follow or extend its reasoning in the context of the Three Strikes law."). *But see People v. Smith*, 1 Cal. Rptr. 3d 901, 907-29 (Ct. App. 2003) (Johnson, J., concurring in part and dissenting in part) (relying on *Tighe* to argue against the use of a prior nonjury juvenile conviction to

enhance a defendant's sentence). Likewise, the Third, Eighth, and Eleventh Circuits have held that the *Apprendi* "prior conviction" exception includes nonjury juvenile adjudications, which can be used to enhance a defendant's sentence. *United States v. Burge*, 407 F.3d 1183, 1190-91 (11th Cir.) (holding that a juvenile adjudication may be used as a "prior conviction" for *Apprendi* purposes), *cert. denied*, 126 S. Ct. 551 (2005); *United States v. Jones*, 332 F.3d 688, 696 (3d Cir. 2003) (stating that "we find nothing in *Apprendi* or *Jones*, two cases relied upon by the *Tighe* court . . . , that requires us to hold that prior nonjury juvenile adjudications that afforded all required due process safeguards cannot be used to enhance a sentence"); *United States v. Smalley*, 294 F.3d 1030, 1033 (8th Cir. 2002) ("We therefore conclude that juvenile adjudications can rightly be characterized as 'prior convictions' for *Apprendi* purposes, and that the district court did not err in increasing [the defendant's] sentence based on his prior juvenile adjudications."); *cf.* Note, *Constitutional Law—Right to Jury Trial—Eighth Circuit Holds an Adjudication of Juvenile Delinquency to Be a "Prior Conviction" for the Purposes of Sentence Enhancement at a Subsequent Criminal Proceeding*, 116 Harv. L. Rev. 705, 708 (2002) (comparing various circuits' approaches and suggesting that "*Tighe*'s understanding of the jury trial right is more consistent with the implications of the Supreme Court's recent jury trial jurisprudence"). To date, the Supreme Court has not resolved the conflict.

**[20]** Although we are not suggesting that *Tighe* was incorrectly decided, as some of these varying interpretations of *Apprendi* suggest, the opinion does not represent clearly established federal law "as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In general, Ninth Circuit precedent remains persuasive authority in determining what is clearly established federal law. *See Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999) (stating that Ninth Circuit case law may be used to help determine clearly established federal law). But, in the face of authority that is directly contrary to *Tighe*, and in the absence of

explicit direction from the Supreme Court, we cannot hold that the California courts' use of Petitioner's juvenile adjudication as a sentencing enhancement was contrary to, or involved an unreasonable application of, Supreme Court precedent.

**[21]** AFFIRMED in part; REVERSED AND REMANDED in part, with instructions to enter a conditional writ of habeas corpus, ordering Mobassa Boyd's release unless the State provides to him, without charge, a complete voir dire transcript within a reasonable period of time, after which he may renew his *Batson* claim in the district court.